**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ELLEN BETZ** <br><br> *Plaintiff*, <br><br> **v.** <br><br> **TEMPLE HEALTH SYSTEMS** <br><br> *Defendant*. | **CIVIL ACTION** <br> **No. 15-cv-00727** |

**PAPPERT, J.**                                               **JANUARY 13, 2016**

## MEMORANDUM

Ellen Betz ("Betz"), a registered nurse, filed this lawsuit against her former employer, Temple Health Systems ("Temple"). Betz alleges that she repeatedly complained to her supervisors about persistent sexual harassment, inappropriate touching and groping among the other nurses. Betz claims that as a result of her complaints, which culminated in an Equal Employment Opportunity Commission ("EEOC") charge in January 2014, Temple suspended and then fired her in violation of Title VII of the Civil Rights Act of 1964 ("TitleVII"), the Pennsylvania Human Relations Act ("PHRA") and the Family and Medical Leave Act ("FMLA"). Betz also alleges that Temple, after terminating her employment, defamed her and interfered with prospective employment contracts. Temple responds that Betz's suspension and termination were not in retaliation for her complaints, but rather the result of a serious medical error Betz committed, which she subsequently attempted to hide by altering patient records. It also claims that there is no credible evidence to sustain her common law claims of defamation and interference with contractual relations.

Temple's seeks summary judgment in its favor on all claims. Based on an extensive review of the record, the Court finds that genuine issues of material fact remain as to whether:

1

(1) Temple retaliated against Betz in violation of Title VII and the PHRA; (2) Temple interfered with Betz's FMLA benefits; and (3) Temple is liable for defamation and interference with contractual relations.  The Court also finds that no reasonable juror could conclude that Temple retaliated against Betz for using her FMLA leave.  Accordingly, and as explained below, Temple's motion is denied in part and granted in part.

## I.

Betz began working at Temple's Northeastern Hospital in 2003.  (Def.'s Stmt. of Facts ("Def.'s SMF") ¶ 6.)  Temple closed Northeastern in 2009 and Betz obtained a position as a registered nurse in the Medical/Surgical Unit at Jeanes Hospital, another hospital within Temple's network. (Pl.'s Stmt. of Facts ("Pl.'s SMF") ¶ 2; Def.'s SMF ¶ 10.)  Throughout Betz's tenure, she worked on different floors, depending on the hospital's needs.  (*Id.* ¶ 11.)  Betz testified that between 2003 and 2009 she "got along with [her] manager great," that it "was a friendly atmosphere," and that she had "no problems whatsoever."  (Pl.'s SMF, Ex. A ("Betz Dep.") 48:5–8.)

## A.

In late 2012, Temple temporarily assigned Betz to the Medical/Surgical Unit on Floor 4A to fill in for a nurse on leave.  (Def.'s SMF ¶ 12.)  Dawn O'Connor ("O'Connor") was the Nurse Manager for Floor 4A.  (*Id.*)  In November 2012, while working on Floor 4A, Betz for the first time complained about sexual harassment.  (Pl.'s SMF ¶¶ 16, 17.)  Specifically, Betz complained about the other nurses grabbing each other and touching each other inappropriately.  (*Id.*, Betz Dep. 53:17.)  Betz testified that there was at least one instance where the sexual activity was directed at her: "[Someone] came up and grabbed me right in the back of my butt.  Grabbed me with a full hand.  Their hand was right in the crack of my buttock [sic]. . . .  It's aggressive sexual behavior to me."  (Betz. Dep. 52:8–13.)  Betz testified that after this incident, she "went to

Dawn [O'Connor], and . . . told her what happened.  And she said to me, 'Come on.  You know this is how my girls play.'"  (*Id.* 52:16–18.)

As the sexual activity among the nurses on Floor 4A persisted, Betz "complained over and over again" throughout this time period "to the corporate office."  (Pl.'s SMF ¶ 17; Betz Dep. 53:17–54:2.)  Betz testified that she went to O'Connor who "told [Betz] personally that [she] was going to be fired because [she] kept on complaining."  (Betz Dep. 53:24–54:2; 54:20–23.)  Around this time, in February 2013, Temple terminated Tara Beissel ("Beissel"), a fellow nurse and acquaintance of Betz, after it discovered that Beissel was inactive for approximately four to five hours during her shift.  (Def.'s SMF ¶ 22; Betz Dep. 61:14–18.)  Temple believed that instead of caring for her patients, Beissel was on the computer helping Betz with her schoolwork.  (Def.'s SMF ¶ 23.)  In exchange, Betz was taking care of patients for whom Beissel was responsible.  (*Id.*)  Betz testified that after Temple terminated Beissel, O'Connor told Betz that "[i]f you don't shut your mouth, you're next because you already complained and we're sick of hearing from you."  (Betz Dep. 110:25–111:1.)

In early March 2013, Betz told others at Temple that she had retained a lawyer with respect to her complaints of the continuing harassment.  (Pl.'s SMF ¶ 30, Ex. I.)  On March 13, 2014, Betz wrote an email to Temple's Chief Executive Officer Dr. Larry Kaiser ("Kaiser"), Interim Vice President for Human Resources Caryl Mahoney ("Mahoney"), Employee Relations Manager Brenna Woods ("Woods") and Human Resources Manager Elisabeth Donahue ("Donahue").  The email detailed an incident on Floor 4A, which involved the nurse manager "badger[ing]," "bullying," "using scare tactics," and "trying to intimidate me into going into her office alone."  (Pl.'s SMF, Ex. L.)  The email stated that when Betz did go into the nurse manager's office alone, "she accused me of something I never did."  (*Id.*)  The email did not

mention sexual harassment, but only referred to "the scare tactics and bullying that keeps occurring." (*Id.*)

In March 2013, Woods undertook a comprehensive investigation into Betz's concerns. (Def.'s SMF ¶ 47, Ex. 12.) On March 26, 2013, Betz sent an email to Woods complaining that she was "being discriminated against" because the nurse manager on 4A told her that she could not be a "charge nurse because . . . [Betz was] not a real part of the floor. . . ." (Pl.'s SMF, Ex. M.) Betz stated in the email that she was "losing out on the opportunity to earn more wages like the other RNs." (*Id.*) The email did not mention any sexual harassment directed against Betz, or any inappropriate sexual behavior among the nurses on Floor 4A. Woods responded the following day, stating that she would be "happy to talk" with Betz about her concerns, and that she would "continue to keep [Betz] updated on the status of the investigation." (*Id.*)

In late March 2013, after the nurse who was on leave returned to Floor 4A, Betz transferred to the 5A Medical/Surgical Unit where Danielle Meinel ("Meinel") was the Nurse Manager. (*Id.* ¶ 13; Def.'s SMF, Ex. 17 ("Meinel Dep.") 29:9-30:4.) On April 4, 2013, Betz sent another email to Woods telling her that Betz received a voicemail "from someone who blocked their number." (Pl.'s SMF, Ex. N.) According to Betz, the voicemail stated: "you think you are so smart. You picked the wrong side. When we want someone gone, their [sic] gone. You're next. Just like Tara [Beissel]." (*Id.*) Betz's email did not mention any sexual harassment. Betz could not identify the caller, but suggested that the other nurses on Floor 4A were behind the call because of an ongoing a dispute between them stemming from Beissel's firing. (*Id.*)

Betz complained to Woods that the harassment and intimidation persisted because co-workers thought she was a "whistleblower." (Pl.'s SMF ¶¶ 68, 72.) Woods then asked Betz to

provide her with proof of the Floor 4A nurses' behavior.[1]  (Betz Dep. 99:25–100:2; Woods Dep. 123:13–124:6.)  In response to that request in May, Betz found and presented to Woods photographs of the other nurses on Floor 4A, which appeared to have been taken in the hospital and posted on Facebook almost a year earlier in June 2012.  (Pl.'s SMF ¶ 32, Ex. K; Betz Dep. 104:12–105:11.)  The photographs depicted the nurses fondling or pretending to fondle each other's breasts and genitals.  (*Id.*)  Betz also presented a Facebook status from one of the Floor 4A nurses with lewd comments from other Floor 4A nurses.  (Pl.'s SMF ¶ 39, Ex. K.)  Betz claims that these photographs and comments demonstrate the "sexually hostile" behavior she was subjected to on Floor 4A.  (*Id.* ¶¶ 45–46.)  She also claims to have brought these to Woods's attention prior to May 2013.  (Betz Dep. 104:12–105:11.)

On July 25, 2013, Betz emailed Kaiser "as a follow up to [her] previous Email from March."  (Pl.'s SMF, Ex. V.)  She stated that "[i]t has been several months, with no resolution, and the harassment and intimidation is not only continuing but getting worse."  (*Id.*)  Betz mentioned in her email the "totally inappropriate" and "very unprofessional pictures that were posted on Facebook."  (*Id.*)  She also mentioned that she feared that the Floor 4A nurses were retaliating against her because Betz was "the one who turned them in."  (*Id.*)

As a result of her investigation into the allegations, Woods ultimately determined that Betz's complaints did not amount to harassment or retaliation as proscribed by Temple's policies.  (Def.'s SMF ¶ 50, Ex. 12.)  In the report documenting her findings, Woods wrote that "[t]here was no information gathered that indicated that there were any actions that were severe, pervasive and ongoing."  (*Id.*, Ex. 12.)  She also wrote that "there were likely instances of bullying or unprofessional interactions on 4A but this investigation did not find timely or specific

---

[1]      The record evidence is unclear as to whether Woods was asking for evidence of sexual harassment specifically, or evidence of the bullying and intimidation that Betz alleged in her communication.

enough information to formally discipline individuals for violating [Temple's] Service Excellence Standards or the Policy against Workplace Harassment and Vio[l]ence." (*Id.*)  In the fall of 2013, Woods sent a letter to Betz formally closing the matter.  (*Id.*, Ex. 13.)

## B.

In March 2013, immediately after Betz's transfer from Floor 4A to Floor 5A and at roughly the same time as her complaints about harassment, Betz's supervisors on Floor 5A began to notice and document mistakes she made while tending to patients.  (Def.'s SMF ¶¶ 58– 83.)  The first incident occurred during her orientation to the floor.  (*Id.* ¶ 60.)  Meinel, the nurse manager of the floor, testified that Betz failed to pull a lever on an antibiotic bag which resulted in the patient not receiving medication.  (Meinel Dep. 59:19–61:3.)  The medication that was being administered to the patient required the nurse to pull a lever that would then infuse saline solution with the antibiotic.  That mixture was then supposed to flow into the patient's veins through an IV.  (Def.'s SMF ¶ 61.)  Meinel verbally coached Betz after this incident, rather than formally documenting it.  (*Id.* ¶ 62.)  Betz disputes that she made a mistake and contends that she administered the medication properly.  (Betz Dep. 146:19–20.)

The next incident occurred in May 2013 when Betz was examining a patient.  (Def.'s SMF ¶ 63.)  Betz documented that the patient had "normal skin" when in fact the patient had "multiple ulcerated areas on both feet and ankles." (*Id.* ¶ 64.)  She reportedly failed to examine under the patient's socks where the skin condition existed.  (*Id.*)  Betz testified that "[i]t's a mistake that I made.  I did not look at his foot.  I trusted him.  He just wouldn't show us the bottom of his feet."  (Betz Dep. 154:4–6.)  Temple treated this infraction as an "Initial

Discussion" in its disciplinary step procedure,[2] gave Betz a plan for improvement and reviewed its documentation policy with her.  (Def.'s SMF ¶¶ 65–66.)

The third incident occurred in August 2013 when Betz allegedly failed to activate another antibiotic bag, which again resulted in a patient not receiving medication.  (*Id.* ¶ 69.)  The bag required the nurse to activate a plunger and then shake the bag to mix the antibiotic with the saline.  The mixture would then be administered to the patient.  (*Id.*)  Temple gave Betz a "Written Warning" for this mistake.  (*Id.*)  Betz denies that she ever failed to activate the bag properly and subsequently filed a grievance with the Union.  (Betz Dep. 156:15–157:2; Def.'s SMF ¶ 70, Ex. 20.)  After an investigation into the matter, a neutral investigator concluded that "the discipline issued to Ms. Betz was warranted" but there were "contributing factors that . . . played a role in this incident."  (Def.'s SMF ¶ 70, Ex. 20.)  As a result, the discipline was reduced from a "Written Warning" to a "Verbal Warning" in Betz's file in October 2013.  (*Id.*)

Betz alleges that Temple issued the Written Warning "to block [a] transfer" Betz sought within Temple's network of hospitals.  (Def.'s SMF ¶¶ 72–74; Pl.'s Resp. to Def.'s SMF ¶ 74.)  Temple's policies state that employees with documentation of discipline in their record, such as a written warning, are ineligible to apply for a transfer within Temple until they have been free of discipline for twelve months.  (Def.'s SMF ¶ 74.)  Temple maintains that the discipline was warranted, and that Betz would not have been eligible for a transfer in any event since she failed one of the tests she was required to pass during the interview process.  (*Id.* ¶ 73.)  The position which Betz was seeking was filled before she could retake the test and before the written warning was reduced to a verbal warning.  (*Id.* ¶ 75.)

---

[2] Temple's progressive discipline procedure starts at "Initial Discussion," then elevates to "Written Warning" and then to "Final Written Warning."  (Def.'s SMF ¶ 67, Ex. 15.)  After the Final Written Warning, an employee is placed on a one-day suspension.  Temple reserves the right to deviate from this procedure based on the nature of the employee's conduct.  (*Id.*)

The final incident, which led directly to Betz's termination, occurred in December 2013 (the "December Incident").  During Betz's shift on December 28, 2013, she asked her co-worker, Kathy Kleinbrahm ("Kleinbrahm"), to co-sign for a high-alert medication, Heparin, that Betz needed to administer to a patient.  (*Id.* ¶ 76., Ex. 21.)  Temple's policies require two nurses to assess the patient's lab work and Heparin Parameters Protocol to determine how much Heparin the patient should receive.  (*Id.* ¶ 77, Ex. 21.)  The two nurses must then verify that the patient is currently receiving the correct levels of Heparin and sign off together on the Heparin Protocol Flow Sheet.  (*Id.*)

The shift nurse working that evening noticed that the Heparin Parameters used to determine the Heparin infusion for the patient came from another patient's protocol sheet.  (*Id.* ¶ 78, Ex. 21.)  The evening nurse realized the mistake when she found Betz's entry on the other patient's flow sheet.  The error caused the patient to receive Heparin at an infusion rate of 1400 instead of the correct rate of 1300.  The evening nurse reported the medication error.  (*Id.*) Upon hearing of the error, Kleinbrahm disclosed it to her manager, Bethann Habermehl. Kleinbrahm stated that Betz used the wrong patient chart to determine the Heparin Parameters for the patient, and Kleinbrahm signed off without appropriately confirming the parameters.  (*Id.* ¶ 79, Ex. 21.)  Klenbrahm also confirmed that the patient did indeed receive Heparin at a rate of 1400, not 1300.  (*Id.*)

Betz contended that the patient in fact received Heparin at the correct 1300 infusion rate. (*Id.* ¶ 80.)  She maintains that she made a documentation error in the patient's chart, not an error in administering the Heparin.  (*Id.*)  To support her claim that she administered the correct dosage, Betz showed to her supervisor, Karen Finklestein ("Finklestein"), a chart with a note dated December 28, 2013.  The note purports to document that the patient was given Heparin at

8

an infusion rate of 1300.  (*Id.* ¶ 81, Ex. 21.)  Unsure of what dosage was actually administered to

the patient, and to fully disclose any error, Finklestein told Betz "to be truthful and write the

infusion amount that [Betz] believes was given to the patient and have [Kleinbrahm] co-sign the

late entry."  (*Id.*, Ex. 21.)  In response, Betz represented that the patient received Heparin at an

infusion rate of 1300.  (*Id.*)  Kleinbrahm, however, refused to sign the late entry because she

believed the patient was indeed mistakenly administered the drug at a rate of 1400.  (*Id.*)  Shortly

thereafter, Woods initiated an investigation into the incident.  (*Id.*)

## C.

With Woods's investigation ongoing, Betz emailed Donahue on January 9, 2014, stating

that she had filed an EEOC claim against Jeanes Hospital.  (Pl.'s SMF, Ex. P.)  She wrote that

the charge was based on "the continuous discrimination, harassment, and retaliation from

management and nurses that I have endured."  (*Id.*)  Betz claims that she spoke with Woods on

the phone who told her that "[Betz] made a big mistake by going to the EEOC – she promised

me this time would be different."  (Betz Dep. 161:9–12.)   Shortly thereafter, with the

investigation into the incident still ongoing, Betz took a leave of absence from the hospital.

(Pl.'s Resp. to Def.'s SMF ¶ 93; Woods Dep. 212:6–15.)

On January 13, 2014, Betz emailed Kaiser, asking him for "assistance with all of the

harassment and retaliation that I was dealing with at Jeanes Hospital."  (Pl.'s SMF, Ex. Q.)  Betz

describes in her email certain incidents of "retaliation and harassment" by fellow nurses and

supervisors, including deliberate attempts to prevent her from transferring out of Jeanes.  (*Id.*)

The email does not mention any instances of sexual harassment.  Kaiser forwarded the message

internally and wrote: "If there is retaliation or a witch hunt, I assure you that consequences will

flow in a big way.  But if she compromised patient care (several facts support that conclusion), consequences will flow to her.  Either way, I expect we will get closure."  (*Id.*)

On January 17, 2014, while still out on leave, Betz requested intermittent FMLA leave to tend to her son who had previously suffered from acute lymphoblastic leukemia.  (Betz Dep. 30:1–10.)  The disease left him with numerous ailments that necessitate significant care.  (*Id.*)  Temple had twice previously approved Betz's requests for intermittent FMLA leave: one from September 24, 2012 through March 23, 2013, and the other from June 18, 2013 through December 17, 2013.[3]  (Def.'s SMF ¶¶ 16–17.)  Temple approved Betz's January 17, 2014 request on January 20, 2014.  (*Id.*)  Temple's approval letter stated that "[e]xcept for emergencies, employees must notify their Department Manager **two (2) weeks** in advance of medical appointments and treatments."  (*Id.* (emphasis in original).)  In an email dated January 21, 2014, Meinel told Woods that Betz "[c]alled out FMLA for her son tomorrow."  (Pl.'s SMF, Ex. X.)  There is no evidence in the record reflecting that Betz asked for FMLA leave again after January 22, 2014.

Woods testified that she had been in contact with Betz throughout this time period regarding the status of the investigation into the December Incident.  (Woods Dep. 212:19–213:12.)  After interviewing the nurses and nurse managers, Woods concluded that Betz and Kleinbrahm "made a medication error, documentation error and failed to identify a patient receiving a high alert medication" in violation of Temple's policies.  (*Id.*)  Woods also found that Betz violated Temple's policies by "altering the incorrect medication infusion rate (1400) on Patient A's medical chart to what would have been the correct infusion rate (1300) to attempt to cover up a medication error."  (*Id.*)  Betz maintained that she did not make any error in

---

[3]      Betz admits that her current lawsuit has nothing to do with either of these two previous FMLA leaves. (Betz Dep. 196:15–23; 198:3–7.)

10

administering the medication, and that "someone is trying to make it look like she did by falsifying information within a medical chart and increasing the infusion rate from 1300 to 1400." (*Id.*)  Woods, however, concluded that the information she received during her investigation "point to [Betz] misrepresenting information" and that there was no basis to "discredit the statements that were made by the 4 RNs and the 2 Nurse Managers who were investigating the error." (*Id.*)  Woods also found that Betz's statement about the incident had "multiple inconsistencies." (*Id.*)

At some point between January 22 and 26, 2014, Woods and Meinel called Betz to tell her that she needed to come to the hospital for a meeting regarding the investigation into the December Incident. (Betz Dep. 171:12–17.)  Betz claims that she told Woods that "[m]y son is sick."  In response, Meinel told her that "[y]ou need to come in . . . to face the music, Ellen.  You have to come to work Monday [January 27, 2014]." (*Id.* 171:13–17.)  When Betz came to the hospital on January 27, 2014, Temple suspended her pending further investigation of the medication error. (Def.'s SMF ¶ 94.)  Temple then formally terminated Betz on February 21, 2014. (*Id.* ¶ 95, Ex. 23.)

### D.

Betz alleges that after she lost her job, two people interested in hiring her, Bernadette Appiott ("Appiott") and Susan Sommers ("Sommers"), spoke to Temple nurse recruiter John Lavery ("Lavery") on the telephone. (Def.'s SMF ¶ 96, Ex. 24.)  In affidavits, Appiott and Sommers state that Lavery spoke poorly of Betz.[4] (Def.'s SMF, Ex. 24.)  Specifically, Appiott states that Lavery told her that "it wouldn't be wise for me to hire [Betz] as she created a lot of trouble while working there and that in fact, she was suing the hospital." (*Id.*)  Similarly,

---

[4]     Temple did not depose either Appiott or Sommers.

Sommers states that Lavery told her Betz "had become a problem . . . and that she was trouble and he would not recommend me hiring her for my mother." (*Id.*)

Temple points out that Sommers is Betz's sister, "who allegedly was going to pay Betz to take care of their mother in the same home in which Betz was currently living." (Def.'s SMF ¶ 99.) Temple also asserts that Appiott is a "former acquaintance that Betz knew from Northeastern Hospital." (*Id.* ¶ 101.) There is no record evidence to the contrary.[5]

Lavery denies ever speaking with either Appiott or Sommers. Temple claims that it does not provide employment references over the telephone. (Def.'s SMF ¶ 98.) It maintains that all references are directed to Human Resources and only dates of employment are provided in response to a written request. (*Id.*)

**E.**

On February 13, 2015, Betz filed a complaint against Temple. (ECF No. 1.) After Temple filed a partial motion to dismiss and motion to strike, (ECF No. 6), Betz amended the complaint on May 1, 2015. (ECF No. 8.) The amended complaint alleged: (1) violations of Title VII based on Sexual Harassment and a Hostile Work Environment; (2) Title VII Retaliation; (3) FMLA Interference; (4) FMLA Retaliation; (5) violation of the PHRA for Sexual Harassment and Hostile Work Environment; (6) PHRA Retaliation; (7) Defamation; and (8) Interference with Contractual Relations. (*Id.*)

On August 7, 2015, the Court dismissed Betz's Title VII and PHRA claims for sexual harassment and hostile work environment, Counts I and V of the Amended Complaint. (ECF No. 20.) The Court held that Betz failed to allege facts suggesting that the "alleged conduct was intentionally directed at her." (*Id.* at 5.) Additionally, even if Betz did allege facts sufficient to

---

[5]     Betz states that Sommers is her "estranged sister," (Pl.'s Resp. to Def.'s SMF ¶ 101), and that Appiott was an "acquaintance." (Betz Dep. 206:22.) Betz testified that Appiott has "breast cancer, thyroid cancer, and her husband is ill and her daughter has some kind of child problem" and that "she needed a nurse." (*Id.* 206:18–25.)

show that the conduct was directed at her, she has failed to demonstrate that they were directed at her because of her sex.  (*Id.*)

Temple filed its motion for summary judgment on November 11, 2015.  (ECF No. 28.)  It asserts that all of Betz's remaining claims are without merit because, among other things, Temple did not retaliate against Betz, it had a legitimate non-discriminatory reason for firing her and it did not interfere with her FMLA leave.  (*Id.*)  Additionally, it argues that Betz has not submitted any credible evidence to support her claims of defamation and interference with contractual relations.  (*Id.*)  In response, Betz argues that there are sufficient facts in the record to support a finding in her favor of all remaining claims.  (ECF No. 35.)  Specifically, she claims that she has presented a causal connection between a protected activity and her termination, and that Temple's alleged reasons for her termination are pretextual.  (*Id.*)  The Court heard oral argument on Temple's Motion on January 5, 2016.  (ECF No. 43.)

## II.

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  A mere scintilla of evidence in support of the non-moving party will not suffice; there must be evidence by which a jury could reasonably find for the non-moving party.  *Id.* at 252.

In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Prowel v. Wise Bus. Forms*, 579

13

F.3d 285, 286 (3d Cir. 2009).  The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment.  *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III.

Betz's retaliation claims under Title VII and the PHRA involve an identical analysis and can be considered together.  *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002) ("The language of the PHRA is . . . substantially similar to these anti-retaliation provisions, and we have held that the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently.").  Section 704(a) sets forth Title VII's antiretaliation provision:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

§ 2000e–3(a).

The burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to Betz's retaliation claims.  Under this framework, Betz must first establish a prima facie case of retaliation.  *See Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014).  If she succeeds, the burden shifts to Temple to articulate a legitimate, non-discriminatory reason for her termination.  *Id.*  If Temple is able to do so, the burden then shifts back to Betz to prove, by a preponderance of the evidence, that the articulated reason was pretext for the retaliation.  *Id.*

Here, when viewing the facts in a light most favorable to Betz, genuine issues of material fact exist to preclude summary judgment on her Title VII and PHRA retaliation claims.

To establish a prima facie case of retaliation, Betz must show that: (1) she engaged in protected conduct; (2) that she was subject to an adverse employment action subsequent to such activity; and (3) that a causal link exists between the two. *See Fries v. Metro. Mgmt. Corp.*, 293 F. Supp. 2d 498, 502 (E.D. Pa. 2003) (citing *Fogelman v. Mercy Hospital, Inc.*, 283 F.3d 561, 567 (3d Cir. 2002)). The parties do not dispute that Betz's EEOC filing was a protected activity under Title VII. (Def.'s Motion for Summ. J. at 18, ECF No. 28.) Additionally, when viewing the facts in the light most favorable to Betz, her previous informal complaints also constitute protected activity under Title VII. *See Speed v. WES Health Sys.*, 93 F. Supp. 3d 351, 357 (E.D. Pa. 2015) ("[I]nformal complaints to management are considered protected activities under Title VII's opposition clause.").[6] Betz suffered adverse employment actions when she was suspended on January 27, 2014, and then terminated on February 21, 2014.

When establishing a causal connection between the protected activity and an adverse employment action, Title VII retaliation claims require proof that the plaintiff's participation in a protected activity constituted a but-for cause of the adverse action. *See Reaves v. Pennsylvania State Police*, 597 F. App'x 92, 97 (3d Cir. 2015) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517 (2013)). Temporal proximity between the protected activity and the adverse

---

[6]     Temple asserts that Betz's complaints beginning in March 2013 did not involve sexual harassment and thus were not protected activity under either Title VII or the PHRA. Temple's position is supported by the documentary evidence—specifically, the numerous letters that Betz sent to administrators and supervisors at Temple in 2013— which, for the most part, complain of bullying rather than sexual harassment. (*See* Pl.'s SMF, Exs. L, M, N, V.) Betz maintained in her deposition, however, that she made numerous verbal complaints of sexual harassment and inappropriate sexual behavior to her supervisors. When viewing the facts in the light most favorable to Betz at this stage, and crediting a plaintiff's deposition testimony in Title VII discrimination cases, *see Weldon v. Kraft*, 896 F.2d 793, 799-800 (3d Cir. 1990) (discussed *infra*), there is sufficient evidence to conclude that Betz made complaints in 2012 and/or 2013 that constitute protected activity.

employment decision may be considered evidence of causation when the timing is "close."[7]  *Id*; *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir.1997).  To be "unusually suggestive" and dispositive of a causal connection, the temporal proximity between the two must be extremely close in time: "temporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence."  *Conklin v. Warrington Twp.*, No. Civ.A. 06–2245, 2009 WL 1227950, at *3 (M.D. Pa. April 30, 2009); *see Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003) (holding that temporal proximity of ten days is sufficient to establish causation only when accompanied by other evidence of wrongdoing).  "[I]n cases where temporal proximity is not 'unusually suggestive' of retaliatory motive, the Third Circuit has demanded further evidence to substantiate a causal connection."  *McCloud v. United Parcel Serv., Inc.*, 543 F. Supp. 2d 391, 401–02 (E.D. Pa. 2008).  "Such other evidence may include, but is not limited to, a 'pattern of antagonism' by the employer that could link the adverse action with Plaintiff's complaint."  *Id*.

Betz filed an EEOC charge on or about January 9, 2014.  She was suspended eighteen days later on January 27, 2014.  Though this may not be sufficient, on its own, to establish a prima facie case, it is sufficient when combined with the instances of antagonism in the record to shift the burden to Temple.  Betz testified, for example, that Woods told her that she "made a big mistake by going to the EEOC."  (Betz Dep. 161:9–12.)  Woods also allegedly told Betz in early

---

[7]      In *Ross v. Gilhuly*, 755 F.3d 185, 194 (3d Cir. 2014), the Third Circuit Court of Appeals stated that an employee "cannot easily establish a causal connection between his protected activity and the alleged retaliation when he has received significant negative evaluations before engaging in the protected activity."  As applied to this case, that would suggest that Betz would have difficulty showing causation since she has negative evaluations prior to her filing of the EEOC complaint.  Betz, however, has advanced sufficient facts to allow a reasonable factfinder to conclude that another protected activity—her complaints of sexual harassment—occurred prior to the negative evaluations.  The Court therefore cannot necessarily conclude, when viewing the facts in the light most favorable to Betz, that the negative evaluations occurred prior to a protected activity.  Considering that Betz's burden of demonstrating her prima facie case is "minimal," *Waldron v. SL Industries, Inc.*, 56 F.3d 491, 494 (3d Cir.1995), Betz's claim survives the prima facie step.

2013 after Beissel's termination that "[i]f you don't shut your mouth, you're next because you already complained and we're sick of hearing from you."  (*Id*. 110:25–111:1.)  Similarly, on another occasion, Woods told Betz that she "was going to be fired because [Betz] kept on complaining."  (Betz Dep. 53:24–54:2; 54:20–23.)  In combination with the relatively short timeframe between the filing of her EEOC charge and her suspension, this is sufficient to overcome plaintiff's relatively "minimal" burden of establishing a prima facie case of retaliation under Title VII and the PHRA.  *See Straka v. Comcast Cable*, 897 F. Supp. 2d 346, 355 (W.D. Pa. 2012) (citing *Waldron v. SL Industries, Inc.*, 56 F.3d 491, 494 (3d Cir. 1995)) ("Plaintiff's burden [in establishing a prima facie case] is 'minimal' and is viewed as a means of presenting a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.").

Under the *McDonnell-Douglas* framework, the burden shifts to Temple to provide a legitimate non-discriminatory reason for Betz's suspension and subsequent termination.  Temple's burden at this stage is "relatively light" and its explanation for suspending and then terminating Betz must simply "permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  *Fuentes v. Perskie*, 32, F.3d 759, 763 (3d Cir.1994).  Temple easily satisfies this burden.  After an extensive investigation, Woods concluded that Betz "violated the Jeanes Management of High Risk and High Alert Medication (E41) and [Temple] Corrective Action Policy 950.544 for Misrepresentation and Falsification which warrants immediate discharge."  (Def.'s SMF, Ex. 21.)  The investigation into the December Incident was well documented and its conclusions were supported.  This is sufficient to allow a factfinder to conclude that Temple suspended and terminated Betz for a legitimate non-discriminatory reason.

To survive a motion for summary judgment where the employer has met its evidentiary burden of articulating a legitimate nondiscriminatory purpose for its actions, the plaintiff must provide direct or circumstantial evidence of pretext with sufficient probative force from which the fact finder could reasonably either: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 (3d Cir. 1998) (citing *Fuentes*, 32 F.3d at 764). The second method requires "the plaintiff [to] point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [retaliation] was a motivating or determinative factor in the employment decision." *Id.* at 644–45 (citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1111 (3d Cir. 1997)).

A factfinder can reasonably draw this conclusion from the evidence in the record. Betz testified at her deposition that in approximately February 2013, Woods told her that: she "was going to be fired because [she] kept on complaining," (Betz Dep. 53:24–54:2; 54:20–23); and that "[i]f you don't shut your mouth, you're next because you already complained and we're sick of hearing from you." (Betz Dep. 110:25–111:1.) Betz also testified that in approximately January 2014, after she filed her EEOC complaint, Woods told her that she "made a big mistake by going to the EEOC." (Betz Dep. 161:9–12.)

Temple responds that Betz's statements are "self-serving" and "unsubstantiated." (Reply to Mot. for Summ. J. at 1.) Temple claims that Betz "has simply resorted to making things up as she goes along," and that she is "using her own deposition testimony as . . . smoke and mirrors." (*Id*.) Betz's deposition testimony is not so easily disregarded at the summary judgment stage. The Third Circuit has stated that "there is no rule of law that the testimony of a discrimination

plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion." *Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990) (citing *Jackson v. Univ. of Pittsburgh*, 826 F.2d 230, 236 (3d Cir. 1987)).  In *Weldon*, the Third Circuit reversed the district court's grant of summary judgment in favor of the defendant-employer. *Id.* at 800.  Weldon brought a lawsuit against his former employer, Kraft, alleging among other things Title VII discrimination. *Id.* at 793.  He made numerous allegations about his former supervisor, including that he "treated blacks unfairly." *Id.* at 795.  The Third Circuit held that the district court improperly decided to disregard his testimony: "[i]f a factfinder were to credit [plaintiff's] testimony regarding the harshness of the treatment he and other blacks received . . . it could conclude that the performance evaluations were unfair and that Kraft's explanations were pretextual." *Id.* at 799.  It continued: "[t]he issue of pretext in this case turns largely on the credibility of competing testimony.  As such, it is inappropriate to decide on a motion for summary judgment." *Id.* at 800.

Similarly here, finding in Temple's favor on these claims would involve assessing the credibility of the witnesses and weighing the evidence.  It would require the Court to find Betz's testimony unbelievable, and instead credit Temple's version of events.  That is not consistent with viewing the facts in the light most favorable to Betz at this stage.  It also runs counter to the jury's job to make credibility determinations. *See, e.g., id.* at 799–800.  The role of the Court at this stage is to determine whether the record, including Betz's testimony, contains genuine issues of material fact—not whether witness testimony is credible.  Betz testified that Woods made certain specific statements at various points in 2013 and 2014 which are directly indicative of retaliation.  It will be up to the jury, not the Court, to assess Betz's credibility on those points.

## VI.

Betz also alleges two causes of action under the FMLA: interference and retaliation.  An FMLA interference claim arises under 29 U.S.C. § 2615(a)(1), which makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.  An FMLA retaliation claim arises under 29 U.S.C. § 2615(a)(2), which makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA.  *See Callison v. City of Philadelphia*, 430 F.3d. 117, 119 (3d Cir. 2005).

### A.

To succeed on her FMLA interference claim, Betz must establish: (1) she was an eligible employee under the FMLA; (2) Temple was an employer subject to the FMLA's requirements; (3) Betz was entitled to FMLA leave; (4) Betz gave notice to the defendant of her intention to take FMLA leave; and (5) Betz was denied benefits to which she was entitled under the FMLA. *Ross*, 755 F.3d at 191–92.  "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Callison*, 430 F.3d. at 119–20.  "Because the FMLA is not about discrimination, a *McDonnell Douglas* burden-shifting analysis is not required."  *Sommer v. The Vanguard Group*, 461 F.3d 397, 399 (3d Cir. 2006).

The first three elements are easily met: Betz was eligible for intermittent FMLA leave; Temple was an employer subject to FMLA's requirements; and Betz was entitled to intermittent leave.  (*See* Pl.'s SMF, Ex. R.)  The critical questions here center on the fourth and fifth elements: whether Betz provided sufficient notice of her intention to take FMLA leave, and whether Temple denied her a benefit to which she was entitled.

The notice element is "not a formalistic or stringent standard." *Lichtenstein*, 691 F.3d at 303. When the leave is unforeseeable, the employee's obligation is to "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." *Id.* (citing 29 C.F.R. § 825.303(b)). However, "[i]n doing so, the employee 'need not expressly assert rights under the FMLA or even mention the FMLA.'" *Id.* (quoting 29 C.F.R. § 825.303(b)). The employee need only provide "'sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request.'" *Id.* (quoting 29 C.F.R. § 825.303(b)). Further, "'where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee . . . to ascertain whether leave is potentially FMLA-qualifying.'" *Id.* (quoting 29 C.F.R. § 825.303(a)). The key consideration for determining whether the employee's notice was adequate "is how the information conveyed to the employer is reasonably interpreted." *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007). This is "generally a question of fact, not law." *Lichtenstein*, 691 F.3d 294 at 303.

Here, the record is unclear as to what notice Betz gave to Temple, and when she provided it. The record reflects that Betz was out on leave—using some combination of sick leave, vacation days and FMLA leave—starting shortly after she notified Temple of her EEOC charge on January 9, 2014. (Pl.'s Resp. to Def.'s SMF ¶ 93; Woods Dep. 212:6–15.) Betz testified that Woods and Meinel "only let me take a day or two [of FMLA leave] and then . . . said, '[y]ou must come back to work.'" (Betz Dep. 199:17–18.) When Betz told Woods and Meinel that she could not return to work because her son was sick and she "need[ed] to take some time off," Meinel told her that "[y]ou must come back to work . . . . You have to come back and face the music." (*Id.* 171:11–17; 199:13–20.)

A reasonable factfinder may determine that Betz cleared the relatively low hurdle of providing notice to Temple of her intent to take FMLA leave.  Indeed, the statute contemplates the possibility that an employee may experience "unforeseeable" circumstances where it is impossible to comply with the notice requirement prescribed by the employer.  29 C.F.R. § 825.303(a).  In those cases, the employee must provide notice "as soon as practicable."  *Id.* Though "[c]alling in 'sick'" is not sufficient to trigger the notice requirement, 29 C.F.R. § 825.303(b), it is incumbent upon the *employer* to inquire further if the information provided is not sufficient.  *See Lichtenstein*, 691 F.3d at 303 (citing 29 C.F.R. § 825.303(a)).  The record suggests that Betz told Meinel and Woods that she needed additional time to care for her son and that they responded by telling her that she needed to come into work.  Thus, genuine issues of fact remain regarding whether Betz gave notice of her intent to take FMLA leave on January 27, 2014 and if this complied with the requirements of § 825.303.

Finally, "[i]n order to assert a claim of interference, an employee must show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits."  *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 401 (3d Cir. 2007).  Temple asserts that "summon[ing] [Betz] on one occasion while she was on leave for a meeting that would have taken less than an hour . . . does not constitute FMLA interference—especially considering Betz had been calling Woods during this time."  (Mot. Summ. J. at 25, ECF No. 28.)  Temple does not cite any support for this proposition.  The Third Circuit has made it clear that "[i]n order to assert a claim of deprivation of entitlements, the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them." *Callison*, 430 F.3d. at 119–20.  There is sufficient evidence in the record to suggest that Betz has

met this burden.  Accordingly, whether Temple interfered with her FMLA benefits is a question more properly addressed by the jury.

## B.

Betz, however, cannot sustain a claim of FMLA retaliation.  Like her Title VII retaliation claim, FMLA retaliation is analyzed through the burden-shifting framework established in *McDonnell Douglas*.  *See Lichtenstein*, 691 F.3d at 302.  There is no evidence of stray remarks, ongoing antagonism, or any other statements or inconsistencies to suggest that Temple retaliated against Betz for taking FMLA leave.[8]  To the contrary, the record demonstrates that Temple granted Betz intermittent FMLA leave on two prior occasions, which Betz recognizes are not at issue in this suit.  (Def.'s SMF ¶¶ 16–17.)   Unlike Betz's Title VII and PHRA retaliation claims, which are supported by certain remarks from Woods evincing retaliation, there is no evidence in the record beyond temporal proximity to support Betz's FMLA retaliation claim.  Thus, even if Betz could make a prima facie showing on temporal proximity alone, there is no evidence in the record from which a reasonable juror could conclude that her termination was pretextual, given the legitimate non-discriminatory reason supporting the adverse employment action taken by Temple.

## V.

Betz's common law claims for defamation and interference with contractual relations rely almost exclusively on the affidavits submitted by Sommers and Appiott.  The affiants state that they were interested in hiring Betz as a nurse.  Sommers, Betz's sister, was interested in hiring Betz to care for their mother while Appiott was interested in hiring Betz to care for herself and her daughter.  (Def.'s SMF ¶ 96, Ex. 24.)  Sommers and Appiott each called Temple and were

---

[8]      Betz concedes that the only record evidence supporting her FMLA retaliation claim is temporal proximity between the usage of her leave and her suspension.  (Hr'g Tr. 66:11–15; 68:23–69:2.)

transferred to Lavery, who told them that he would not recommend hiring Betz. According to the affidavits, Lavery told them, in essence, that Betz "had become a problem," that she was a "liability," and that he would not recommend hiring her. (*Id.*)

Temple unequivocally denies that Lavery had any such conversation with either Sommers or Appiott. (*Id.* ¶ 102.) It claims that Lavery does not field these types of reference calls, and that as a matter of policy, Temple does not provide employment references over the telephone. (*Id.* ¶ 98.) Temple also casts doubt on the legitimacy of Sommers and Appiott's need for a reference: Temple suggests that due to their familiarity with Betz, there are doubts about the validity of their need to obtain a reference from Temple. (*See* Hr'g Tr. 24:9-25:9; Reply to Mot. for Summ. J. at 9.) In essence, Temple challenges the affidavits' credibility.

Temple elected not to depose either Sommers or Appiott despite having the opportunity to do so. (*See* Hr'g Tr. 25:19–20; Opp. to Mot. for Summ. J. at 26.) Rather, they summarily argue that "[n]o credible evidence exists that these people ever actually spoke to John Lavery." (Mot. for Summ. J. at 26, ECF No. 28.) Similar to their arguments regarding Betz's "self-serving" deposition testimony, they invite the Court to make a credibility determination regarding the truthfulness of the affidavits. The Court declines to do so. *See United States v. Clemons*, 658 F. Supp. 1116, 1118 (W.D. Pa. 1987) *aff'd*, 843 F.2d 741 (3d Cir. 1988) ("the court may not substitute its own determination on credibility thus usurping the jury function.) (citing *Burks v. United States*, 98 S. Ct. 2141, 2149 (1978)). If there are as many questions surrounding the veracity of the affidavits as Temple contends, it will have ample opportunity to exploit them when cross-examining Sommers and Appiott at trial.

In response to Betz's common law claims of defamation and interference with contractual relations, Temple briefed only the issues surrounding the legitimacy of the affidavits. It makes

no claim that, even if taking the testimony in the affidavits as true, as the Court is doing, there is no genuine issue of material fact based on the elements of the common law claims.  Indeed, an employer has been found liable for defamation and interference with contractual relations in similar circumstances.  *See Walker v. Grand Cent. Sanitation, Inc.*, 634 A.2d 237, 244 (Pa. Super. 1993) (upholding jury verdict finding employer liable for defamation); *see also Rentzell v. Dollar Tree Stores, Inc.*, No. CIV.A. 10-4270, 2012 WL 707005, at *4–6 (E.D. Pa. Mar. 5, 2012) (discussing viability of defamation and interference with contractual relations claims in context of poor referral).

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.